| 31 | 543 |
| 34 | 785 |
| 31 | 543 |
| 37 | 820 |
| 31 | 543 |
| 41 | 291 |

ST. LOUIS WROUGHT IRON RANGE CO. ET AL., APPELLEES, v. MAX MEYER ET AL., APPELLANTS.

[FILED MARCH 17, 1891.]

Insolvency: CERTAIN CREDITORS MADE TRUSTEES FOR ALL. B. was a *restaurateur*, at Omaha, in failing circumstances, who called his creditors together, the plaintiffs and defendants, who agreed that the property of B. should be taken in charge, in trust, to secure equally all of the creditors, designating M. and A., two of the creditors, as agents and trustees, who took possession of the property and caused to be executed, first to M. and

next to A., and thereafter in priority according to the greater amounts due to each creditor, a series of chattel mortgages by B. The property was sold at public auction under the mortgages of M. and A., and the proceeds distributed accordingly, leaving the claims of others unpaid. In an action by the other creditors against M. and A. for an equal distribution, *held*, that M. and A. were trustees and agents for all the creditors and the proceeds of the sale be paid to the several creditors, *pro rata* according to their respective claims.

APEAL from the district court for Douglas county. Heard below before WAKELEY, J.

*Charles Ogden,* and *Breckinridge & Breckinridge,* for appellants, cited: *Bonns v. Carter,* 20 Neb., 566; *Winner v. Hoyt,* 28 N. W. Rep., 380; 1 Story, Eq. Jur. [13th Ed.], 296; Id., 300, 301 and note (4).

*Congdon & Hunt,* and *Estabrook, Irvine & Clapp,* contra, cited: Pomeroy's Eq. Jur., secs, 959, 1051, 1077 and cases cited: *Bunker v. Miles,* 30 Me., 431; *Tynes v. Grimstead,* 1 Tenn. Ch., 508; *Marshall v. Joy,* 17 Vt., 546; *Grumley v. Webb,* 44 Mo., 444; *Nenendorff v. Ins. Co.,* 69 N. Y., 389; *Merchants Bank v. Rudolf,* 5 Neb., 527; *Grant v. Cropsey,* 8 Id., 205; *Newman v. Muller,* 16 Id., 527; *Davis v. Scott,* 22 Id., 154; *Trustees v. Walden,* 15 Ala., 655; *Higgins v. Halligan,* 46 Ill., 173; *Bunge v. Koop,* 48 N. Y., 225.

COBB, CH. J.

The plaintiffs in the court below alleged ·that they and the defendants Max Meyer & Bro. and Allen Brothers, in May, 1887, were creditors of the defendant Charles Barnard in various amounts set forth in this petition; that Barnard had been conducting a restaurant under failing circumstances in the city of Omaha, and that an agreement was reached between Barnard and his creditors that he should secure the payment of all his indebtedness upon the

property used by him in the business, in such manner that the creditors should participate *pro rata* in the security and proceeds thereof; that the carrying out of this agreement on behalf of the creditors was entrusted to the defendants Max Meyer & Bro. and Allen Brothers, who in violation of said agreement, and in fraud of the plaintiffs, caused to be framed and executed a series of chattel mortgages on the property of said Barnard, so drawn as to give the defendants Max. Meyer & Bro. a first lien upon the property, the defendants Allen Brothers the second lien, and the plaintiffs junior liens in a certain order; that Max Meyer & Bro. and Allen Brothers took possession of the property, sold the same, and applied the proceeds to the payment of their own claims in full, and refused to account to the plaintiffs therefor.

There are certain other allegations of irregularities in the sale and of the value of the property, presenting issues upon which the finding of the district court was adverse to the plaintiffs and not material to this statement.

The court below upon all the allegations stated found for the plaintiffs and decreed that Max Meyer & Bro. and Allen Brothers should pay to the plaintiffs a distributive share of the proceeds of the sale. From this judgment the defendants appealed, and the questions presented are: First, Is there evidence sufficient to sustain the finding as to the agreement? Second, As a legal consequence of that agreement are the plaintiffs entitled to a distributive share of the proceeds of the property of the defendant Barnard?

To determine the first question it is necessary to review the testimony as to the agreement of the parties.

Barnard, the defendant, testified substantially that he called the first meeting of his creditors on May 10, 1887, at the office of N. B. Falconer, notifying defendants Meyer and Allen, and plaintiffs Falconer, Moore, Bliss, and Congdon on the part of the St. Louis Iron Company; that

35

he made a statement of the condition of his business, asking an extension of time, to satisfy his creditors, of three to six months, and an advance of five or six hundred dollars; that he was asked on what security, and he proposed a trust mortgage, and as money was realized that it should be divided equally among his creditors. He then left the room and awaited further communications. He signed the mortgages in Cavanaugh's office, going there at the instance "of the committee Meyer and Allen, who told him that all the papers would be ready; that his proposition to his creditors was acceptable, and that he went there the next morning and signed the mortgages;" that Meyer and Allen then placed a man in charge of the restaurant; that when he signed the mortgages he had not read them, and did not know that they contained preferences as to creditors.

On cross-examination the witness testified that at the first meeting he proposed to mortgage everything contained in the St. Cloud restaurant, *a legal one,* and, *if legal,* they could select any man as trustee, Meyer, or any one else. That as soon as he got $500, or even $100, he was to pay it over, but it was to go to each one alike; that this was to be a mortgage or mortgages, anything they pleased.

In reply to questions by the court the witness stated that after the meeting Meyer and Allen said to him that they, "as representatives of the creditors," were perfectly satisfied with his statement; the witness said that he knew nothing about the law, and did not object to signing a number of mortgages; that he paid no attention to that fact upon the belief that the papers were in some way carrying out his proposition.

C. B. Moore, one of the plaintiffs, testified that he was notified by Barnard that there would be a meeting of his creditors at Falconer's office on May 10th or 11th, at which Barnard, Falconer, Bliss, Adolph Meyer, Ed. Allen, and Moffat, of Dun's agency, were present; that Barnard stated that he was embarrassed and wanted to do all he could to

relieve his creditors, and would give a mortgage on all his property so that it would go to his creditors *pro rata*. The subject was discussed, and it was agreed that two present should draw up a mortgage or mortgages for the benefit of all the creditors; that none should have the preference above the others; that Meyer and Allen were appointed to carry out that agreement, and there was no objection to that course; that nothing was said as to the form of the mortgages, except that no one should have priority; that they had gotten into it together, and would take their *pro rata* dividend of what there was left.

On cross-examination the witness stated that he did not know who proposed the committee, but thought Falconer did; that when appointed does not remember that Allen said anything, but that Meyer agreed to the plan; that nothing was said as to whose name the mortgages were to be made in; that nothing was said about trustees; does not know whether the word used was mortgage or mortgages; the agreement was that Barnard's property was to be secured.

M. H. Bliss testified that he was present, and that the talk was that they should put the matter in shape so that each one of us should get his *pro rata* dividend, each and every one of the creditors; that, a heavy storm threatening, the witness left the meeting saying "this is a fair, square, and straight agreement, and we will abide by it."

N. B. Falconer testified that he was at the first meeting; that Meyer and Allen were appointed a committee to look after the interests and protect the creditors; that it was understood that there would be no preferences; that they were to look for some method of protection, and get the creditors paid in full, or as much as possible; did not remember of any protest against the agreement at the meeting; "they appointed a committee and an agreement was made that they should come in equally, and neither Meyer or Allen protested."

On cross-examination the witness stated that there was a distinct agreement that the mortgages should be *pro rata*, and that Mr. Allen did not refuse to act in the arrangement.

T. H. Moffat, of Dun's agency, called by defendants' testified that he was present at the meeting, but not at the time Barnard made his proposition; that Falconer made the only motion; that he thought the best thing would be to have one or two creditors appointed to see what was best to be done. Witness does not think there was anything said about taking a mortgage, but there was a general acquiescence in Falconer's proposition; that he heard nothing said of prorating, and did not hear Allen say he would not prorate. The arrangement was, "you two gentlemen go ahead and see what is best to be done."

Allen himself testified that at the meeting Moore was anxious that no one should obtain a preference; that Meyer, Barnard, Patch and witness met at Meyer's office the following Monday, and Barnard spoke again of making a mortgage to "all his creditors."

On cross-examination, the witness stated that he did not refuse to act with Meyer at that time, and that on Monday morning he met with Meyer and Barnard, but knows of no reason why; that he told Barnard on Saturday night they might visit him Monday morning. Cavanaugh was instructed to draw up the mortgages for them. In answer to the question, "Then why did you go on and act with Meyer under the instructions of the first meeting, having stated that at the close of the meeting it was suggested by some one that you and Meyer should go and see about this $2,000?" the witness said, "Yes, sir, and some one then made the remark that anything that was done would be satisfactory, I do not remember, but I think it was Mr. Falconer." Witness made no objection to going with Meyer and went and saw Barnard from there.

Adolph Meyer testified that when they met in his office witness told Cavanaugh what Barnard proposed to do, and

Cavanaugh replied, "That cannot be done; you have got to have single mortgages, if you want them legal, in Nebraska." Allen said, then he would come first, and witness replied, "No, sir, I will come first."

From this testimony it is shown that the proposition at the first meeting, of May 10, was as the plaintiff's witnesses testified, and that Meyer and Allen assumed to act upon their appointment.

In response to questions by the court, the witness said that, "as nearly as he could remember what he said to Cavanaugh, it was that Barnard met several of us Saturday evening, and wanted to pay some way, in trust, or make a mortgage covering his indebtedness, so that he could not be closed out; and asked, can it be done? and was told by Cavanaugh, that it could not be done unless he put in a receiver. Get a list of the amounts, Cavanaugh said to witness, and he would make out the mortgages one after another; that witness did not know whether he would have taken such a mortgage if Cavanaugh had said it would be legal, or not." That Cavanaugh expressed no view as to whether the mortgages would be legal, if on an equal footing.

Henry Haegen, one of the creditors, testified that, after the mortgages were on record, Meyer told him that it was agreed at the meeting, that the mortgagees should prorate, but that when he made out the mortgages, they were made prior one to another, "because he was too smart for them."

Isaac E. Congdon, agent for the St. Louis Iron Company, testified that he had the company's claim for collection; that after the mortgages had been recorded he examined them and afterwards said to Adolph Meyer, that the claim was probably the largest, that Barnard had told witness of his situation, invited him to the first meeting of creditors, informed him that he would turn over all his property to his creditors, *pro rata;* that the proposition was fair, but that he could not be at the meeting; that he

informed Meyer of the proposition of Barnard that the mortgagees were going to prorate; in reply, Meyer said that was the understanding, but that Allen was objecting to it.

The testimony of Cavanaugh, who drew the mortgages, throws sufficient light upon the question of how the preference as to creditors was made; that not only the creditors were not parties to it, but the debtor himself had nothing to do with the result. In answer to questions by the court, the witness testified that when he met Meyer and Allen nothing was said as to how the mortgages were to be drawn; a list of the names of creditors was furnished, but no one directed the priority. Meyer & Bro. were his clients; he drew their mortgage first; he had done some work for Allen Bros., he drew theirs second, and the others he gave priority in the order of the amounts, and settled it according to his own idea of what it should be.

The testimony adverse to the plaintiffs is that of Meyer and Allen, who were the preferred creditors by action of the attorney Cavanaugh. The weight of evidence in favor of the alleged agreement of the debtor and creditors, of all the parties to this action, to distribute, *pro rata*, the proceeds of the failing debtor's property is, undoubtedly, such as to support the findings of the court below; that the findings of fact by the district court are entitled to the same weight as the verdict of a jury, and will not be overruled in the face of preponderant testimony, is an authoritative rule, so familiar, and so often reaffirmed by this court as to be exempt from citations in its support. This agreement admitted, was the sale and distribution of the property by Meyer and Allen the act of trustees and agents for the benefit of all the creditors appearing as parties to this suit? It is an established rule that one, having assumed to act as an agent to another, places himself in a fiduciary capacity, and will not be permitted to subvert his functions, or divert them to his personal advantage, or use them contrary to the interests of his principal; and, in the enforcement

of this rule, courts will follow the property and subject it to the constructive trust created, or, in the event of sale and transfer to *bona fide* purchasers, will subject the proceeds to the same operation; and while it is maintained that there was a general consent to the proposition that Meyer and Allen should act as trustees for the creditors, and that Meyer expressly assented, though Allen may have remained silent, yet Allen is believed to be as much bound as if he had expressly assented to assume the trust. In support of this proposition may be cited the authority in the case of *Grant v. Cropsey*, 8 Neb., 205, in which it was held in the opinion by Judge LAKE, "that the rule has been long and firmly established, that where one by his words or conduct willfully causes another to believe in a certain state of things, and induces him to act on that belief, so as to alter his own previous position, the former is concluded from averring against the latter a different state of things as existing at the same time." (*Pickard v. Sears*, 33 Eng. Com. Law Rep., 257; *Davis v. Hardy*, 37 N. H., 65; *Merchant's Bank v. Rudolf*, 5 Neb., 527.) This rule was reaffirmed, in the same words, in the later case of *Newman v. Mueller*, 16 Neb., 528, and applicable to the acts of Allen in this instance, for it is in evidence that he did assume to act as trustee in calling upon the debtor, with Meyer, and informing him that they were so acting, and actually causing mortgages to be executed to the creditors.

From the evidence, it is clear that the debtor was willing to make such a legal mortgage lien upon all his property as would be equal security to all his creditors, which he failed of doing through the acts of the defendants complained of; and as a legal consequence of the agreement of debtor and creditors to that end, the plaintiffs are entitled to a distributive share of the proceeds of the debtor's property. The findings of the district court are fully supported by the weight of evidence and the judgment is

AFFIRMED.

THE other judges concur.